Bernard **TEAGUE**, et alia, plaintiffs,

v.

**ATTALA COUNTY, MISSISSIPPI,**
**et alia, defendants.**

**Civ. A. No. EC 91–209–D–D.**

United States District Court,
N.D. Mississippi, E.D.

Dec. 9, 1992.

---

MEMORANDUM OPINION

DAVIDSON, District Judge.

## I. INTRODUCTION

In the instant case, the plaintiffs attack the 1983 supervisory and justice court judge redistricting plans for Attala County, Mississippi as diminishing minority voting power. The plaintiffs seek declaratory and injunctive relief for the following alleged statutory and constitutional violations: § 2 of the 1965 Voting Rights Act, as amended, codified under 42 U.S.C. § 1973, et seq., and the one person one vote principle ensconced in the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[1] Disposition of the above-captioned matter ensues from a hearing before the undersigned United States District Judge, sitting without a jury, on September 21, 1992, in Aberdeen, Mississippi. After considering the parties' submissions, the oral and documentary proof received at trial, together with the parties' proposed findings of fact and conclusions of law, and the record as a whole, the court finds plaintiffs' claims are unsupported. The 1983 redistricting plan, presently operating in Attala County is in harmony both with § 2 of the Voting Rights Act and the U.S. Constitution. Set out below are the court's factual findings and legal conclusions.[2]

## II. FINDINGS OF FACT

### A. THE DEMOGRAPHICS

According to the 1980 Census, Attala County, Mississippi had a total population of 19,865; blacks accounted for 7,775 or 39.13% of the figure; of the remaining 12,090 or 60.86%, 12,052 or 60.7% were white. In 1990 Census data, Attala County is shown as having a total population of 18,481; blacks represent 7,299 or 39.5% of the county's total population. While the overall population of the county declined,

Ellis Turnage, Morris, Turnage & Associates, Cleveland, MS, for plaintiffs.

Benjamin E. Griffith, Griffith & Griffith, Cleveland, MS, John E. Shaw, Kosciusko, MS, for defendants Attala County, MS, Attala County Democratic Executive Committee, Attala County Republican Executive Comm., and Attala County Election Comm.

1. Implicit in these assertions of federal constitutional and statutory violations is the applicability of 42 U.S.C. § 1983.

2. The court determines the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

the percentage of blacks increased by nearly one-half percent.[3]

As do other counties in Mississippi, Attala County elects its county board of supervisors, board of election commissioners, justice court judges, constables, and other public officials from five separate and distinct supervisory districts of nearly the same size in population. District lines are drawn according to the county's plan of redistricting, and should comport with the U.S. Constitution's "one person one vote" requirement. The current districting outline for the county's board of supervisors was adopted in 1983 when Attala County last reapportioned. In accordance with § 5 of the Voting Rights Act, the 1983 plan was submitted to the U.S. Department of Justice for preclearance; preclearance was granted, December 23, 1983. Similarly, the county's present justice court redistricting plan was precleared, June 10, 1983. The racial breakdown of the existing operative plans is as follows:

### SUPERVISORY DISTRICT PLAN

| DIST. | TOTAL POP. | BLACKS/(%) | WHITES/(%) | OTHER/(%) |
|---|---|---|---|---|
| 1 | 4,049 | 1,384/34.2 | 2,655/65.6 | 10/.2 |
| 2 | 4,092 | 2,124/51.9 | 1,961/47.9 | 7/.2 |
| 3 | 3,934 | 673/17.1 | 3,248/82.6 | 13/.3 |
| 4 | 3,895 | 2,486/63.8 | 1,407/36.1 | 2/.1 |
| 5 | 3,895 | 1,108/28.4 | 2,781/71.4 | 6/.2 |
| | 19,865 | 7,775/39.1 | 12,052/60.7 | 38/.2 |

### SUPERVISORY DISTRICT PLAN USING 1990 CENSUS DATA

| DIST. | TOTAL POP. | BLACKS/(%) | WHITES/(%) | OTHER/(%) |
|---|---|---|---|---|
| 1 | 3,988 | 1,303/32.7 | 2,667/66.9 | 18/.4 |
| 2 | 3,857 | 1,913/49.6 | 1,943/50.2 | 1/.2 |
| 3 | 3,687 | 875/23.7 | 2,790/75.7 | 22/.3 |
| 4 [4] | 3,494 | 2,240/64.1 | 1,251/36.0 | 3/.1 |
| 5 | 3,455 | 968/28.0 | 2,463/71.3 | 24/.2 |
| | 18,481 [5] | 7,299/39.5 | 11,114/60.1 | 68/.3 |

Calculation of the population deviation percentage using the above 1990 figures produces a 14.4% maximum deviation. The relevant computation formula may be expressed via the following equation: [6]

$$\frac{(\text{most pop. dist.}{-}\text{avg. pop.})}{\text{avg. pop.}} + \frac{(\text{avg. pop.}{-}\text{least pop. dist.})}{\text{avg. pop.}} = \% \text{ dev.}$$

3. The black population of Attala County, according to the 1990 Census, rose by .4%.

4. District 4 holds a 59.27% majority black voting age population upon application of 1990 census numbers to the present 1983 redistricting plan:

$$\frac{1,432}{2,416} \text{ (blk. vt. age pop.)} = 59.27\%$$
(tl. vt. age pop.)

5. The total voting age population of Attala County, according to the 1990 Census tally, is 13,435: Blacks account for 35.44%, while the figure for whites is 64.3%; .3% represents "other" remaining individuals.

6.

$$\frac{(3988{-}3696)}{3696} + \frac{(3696{-}3455)}{3696}$$

$$\frac{292}{3696} + \frac{241}{3696}$$

$$7.9\% + 6.5\% = 14.4\%$$

The 1990 Census map boundary delineations within Kosciusko, Mississippi, the county seat of Attala County, do not, however, match those actually in existence. When adjusted to reflect current, existing supervisor district boundary lines, the 1990 Census numbers result in a lower percentage deviation.

### APPLYING 1990 CENSUS DATA TO 1983 SUPERVISORY DISTRICT PLAN USING DISTRICT BOUNDARIES CURRENTLY EXISTING

| DIST. | TOTAL POP. | BLACKS/(%) | WHITES (non-blacks)/% |
|---|---|---|---|
| 1 | 3,898 | 1,345/34.5 | 2,553/65.5 |
| 2 | 3,898 | 2,059/52.8 | 1,839/47.2 |
| 3 | 3,983 | 874/22.0 | 3,109/78.1 |
| 4 | 3,623 | 2,348/64.8 | 1,275/35.2 |
| 5 | 3,620 | 1,024/28.3 | 2,596/71.7 |
| | 19,022 | 7,650/40.0 | 11,372/60.0 |

Calculation of the population deviation percentage using the above 1990 figures in conformance with present district boundaries yields a 9.5% maximum population deviation.[7]

### INCORPORATION OF 1990 CENSUS STATISTICS INTO JUSTICE COURT JUDGE 1983 DISTRICT PLAN

| DIST. | TOTAL V.A. POP. | BLACKS/(%) | WHITES/(%) | OTHER/(%) |
|---|---|---|---|---|
| East | 6,701 | 2,276/34.0 | 4,409/65.8 | 16/.2 |
| West | 6,733 | 2,485/36.9 | 4,231/62.8 | 17/.3 |

| DIST. | TOTAL POP. | BLACKS/(%) | WHITES/(%) | OTHER/(%) |
|---|---|---|---|---|
| East | 9,115 | 3,406/37.4 | 5,673/62.2 | 36/.4 |
| West | 9,366 | 3,893/41.6 | 5,441/58.1 | 32/.3 |

Calculation of the population deviation percentage using the above 1990 figures results in a 2.71% maximum population deviation.[8]

7.

$$\frac{3,983 \text{ (dist. 3)}{-}3,804 \text{ (the avg. dist. pop.)}}{3,804}$$

$$\frac{3,804{-}3,620 \text{ (dist. 5)}}{.3,804}$$

$$\frac{179}{3,804} = 4.7\%$$

$$\begin{array}{r} \underline{184} = 4.8\% \\ + \underline{3,804} \\ 363 \\ \overline{3,804} = 9.5\% \end{array}$$

8.

$$\frac{9,366 \text{ (west)}{-}9,240 \text{ (the avg. dist. pop.)}}{9,240}$$

$$\frac{9,240{-}9,115 \text{ (east)}}{9,240}$$

## B. BLACK CANDIDATE ELECTORAL SUCCESS

Neither side contests the success of blacks in political races for the following positions. Black candidates have sought and won election to the following offices in Attala County:

1) Supervisor of District 4—Jesse J. Fleming (removed from office following conviction for fraud) [9]

2) Election Commissioner, District 4—Virginia Clark (presently sitting)

3) School Board Member, District 2—Aubrey M. Veasy (presently sitting)

4) School Board Member, District 4—Randy Clark

5) Alderman (At Large), Ethel, Mississippi—Melvin Hughes, Jr. (presently sitting)

6) Alderman (Ward 2)—Kosciusko, Mississippi—Billy Coffee (presently sitting)

7) Alderman (Ward 4), Kosciusko, Mississippi—H.L. Myrick (presently sitting)

8) Alderman (At Large), Sallis, Mississippi—Antley Bentley (formerly seated)

9) Alderman (At Large), Sallis, Mississippi—John Robey (presently sitting)

10) Alderman (Ward 2)—Kosciusko, Mississippi—James Bayne (formerly seated)

In modern time, no black candidates ever have won election to public office in Attala County as justice court judge, constable, sheriff, circuit clerk, coroner, county attorney, or state senator, despite a number of efforts. In contrast, blacks have never sought the elective positions of either chancery clerk or tax assessor of Attala County.

| BLACK CANDIDATE | OFFICE | DATE OF POLITICAL RACE |
|---|---|---|
| Mary Brooks Dodd | circuit clerk (county) | August 7, 1979 |
| Doc Drummond | J.P. | August 8, 1967 |
| | mayor of Kosciusko | May 13, 1969 |
| | J.P. | August 3, 1975 |
| H.L. Myrick | alderman, Kosciusko | November, 1977 |
| | alderman, Ward 4, Kosciusko | May, 1981 |
| Jerry C. Lewis | supt. education | August 2, 1971 |
| Jesse Fleming | J.P. | August 3, 1975 |
| | supervisor, Dist. 4 | August 7, 1979 |
| Willie Floyd George | sheriff (county) | August 7, 1979 |
| | supervisor, dist. 1 | Feb. 28, 1984 |
| Charles Phillips | coroner & ranger | August 7, 1989 |
| | | Feb. 28, 1984 |
| | | August, 1987 |
| James Roundtree | supervisor, dist. 1 | August 7, 1987 |
| Taft Hawthorn, Jr. | constable, dist. 1 | August 7, 1987 |
| Zachary Winter | constable, dist. 1 | August 7, 1987 |
| Mary McCarter | J.P. dist. 2 | August 7, 1987 |

$$\frac{126}{9,240} = 1.36\%$$

$$\frac{125}{+9,240} = 1.35\%$$

$$\frac{251}{9,240} = 2.71\%$$

**9.** During the course of this trial, Fleming testified to his trial and conviction in the Circuit Court of Mississippi for Attala County on fraud charges for using county funds to repair his tractor. An appeal of his conviction is pending.

| BLACK CANDIDATE | OFFICE | DATE OF POLITICAL RACE |
|---|---|---|
| Bessie Hancock | J.P. dist. 3 | August 7, 1987 |
| James Bayne | alderman, ward 2, Kosciusko supervisor, dist. 2 | November, 1977 and May, 1981 Feb. 28, 1984 |
| Stan McKinney | alderman, ward 3, Kosciusko | May, 1981 |
| Barbara Woodward | alderman at large Kosciusko | May, 1981 |
| Lucious Patterson | supervisor, dist. 5 | August 7, 1987 |
| L.B. Winters | supervisor, dist. 2 | August, 1987 |
| Murphy Greer | state sen. dist. 19 | August, 1987 |

---

## C. SOCIO–ECONOMIC TRENDS AND CONDITIONS

Both sides offered considerable testimony regarding the level of status attained by Attala County blacks in such areas as education, housing and employment. While defendants emphasized the gains and improvements which blacks collectively experienced, plaintiffs noted that, as a group, blacks continued to trail the levels of attainment for whites in every significant area.

### 1. Income

A comparison between the 1990 and 1980 Census figures for the mean black family income in Attala County indicates a 71% rise. Although the increase for Attala County whites, 53%, is less, the 1990 Census Attala County figure for white mean family income outpaces that for blacks by $9,949 or 42%. Expressed in a different fashion, the mean black family income in Attala County is only 58% of that for whites.[10]

A 21% rise in the number of black households in Attala County with an income level between $15,000 and $24,999 is also evident from Census data analysis;[11] the percentage of white households within this income bracket declined from 85.12 to 67.84%. Notwithstanding the decrease, the white household percentage, 67.84, exceeds the black household percentage, 32.16, by approximately 52.3%. Further gains by Attala County black residents are evident through a comparison of the 1980 and 1990

10.

$23,725 (mean family income-white) (1990 Census)
− 13,776 (mean family income-black) (1990 Census)
____
9,949

$58.067\% \times \$23,725 = \$13,776$

$\frac{13,776 \,[.4]}{23,725} = 58.067\%$

11. The 1980 Census lists, 214, as the number of black households in Attala County with an income level of $15,000–$24,000.00; the 1990 Census reports, 513, an increase of 299, or 21%; the number of white households in this category under 1990 data, 1,082, is down by 142, or 10%, from 1,224, the number in 1980 Census materials.

Census figures for households with an income level between $25,000–34,999.00. The number of black households in Attala County in this range increased by 144, from 45 to 189. Blacks accounted for 21.-21% of total households classified within the $25,000–$34,999 income slot in the 1990 Census. While a strong indicator of the improved economic status of blacks, the percentage figure does not completely capture the monetary gains of blacks in Attala County. A more accurate reading of the rise in black earning power is reflected in the percentage share of black households in the total number of additional households within the $25,000–$34,000 segment: Attala County had a total increase of 505 households within the $25,000–$34,000 grouping; of these, 30% are categorized as black.

To appreciate the full significance of this jump, it is necessary to examine the rate of growth in the number of black Attala County households with an income level between $25,000–34,999, as compared with the rate for white households in this bracket. While both groups experienced an increase, the growth in the number of black households in this category increased at a more rapid rate than the white counterpart. The number of Attala County black households classified in the 1990 Census as having incomes of $25,000–34,999 is 4.2 times the number reported in 1980. The rate of growth for white households in this category was only half that amount: 2.1%. The greater rate of growth is consistent with the greater share in population; during the years following the 1980 Census, the percentage of blacks in Attala County grew, while the percentage of whites decreased. The enhanced black population percentage is consistent with the increased prosperity of Attala County's blacks.

### a. Poverty Level

A comparison between 1990 and 1980 Census figures reveals a decline in the percentage of Attala County adult blacks who live beneath the poverty line; for blacks, the figure dropped from 51.9% in 1980 to 41.9% in 1990; in contrast, the percentage of whites rose from 11.3% to 14%. Even with the sharp decline, the percentage of Attala County adult blacks living underneath the poverty line remains greater than the percentage of whites: Forty-one percent of Attala County's black adult population lives below poverty level in contrast to 14% of the county's white adult population, according to 1990 Census data.

### 2. Education

The number of adult blacks, twenty-five years of age and older, with a high school education increased from 25% to 38.72%; college enrollment rose, as well, from 16% to 40.79%. The percentage of college degrees conferred on blacks rose from 15.31% to 19.07% between the two Census reports.

### 3. Unemployment

While the unemployment rate among Attala County's whites rose from 5.7% to 7.1%, black employment figures improved; black unemployment dropped from 16% in 1980 to 12.9% in 1990.

## III. CONCLUSIONS OF LAW

Original jurisdiction over the parties and subject matter of this case rests with this court pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 1973. Attala County is a political subdivision covered by the Voting Rights Act.

## A. THE § 2 CLAIM

 As with any complaint of a § 2 violation, the court preliminarily addresses whether plaintiffs meet the Supreme Court's pronouncement of a tripartite test in the case of *Thornburg v. Gingles*, 478 U.S. 30, 36–37, 106 S.Ct. 2752, 2759–2760, 92 L.Ed.2d 25, 38 (1986). The three critical factors which plaintiffs must demonstrate to advance a § 2 claim are: (1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single member district; (2) that the minority is politically cohesive; and (3) "that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority

candidate running unopposed—usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51, 106 S.Ct. at 2766, 92 L.Ed.2d at 46–47. As an initial hurdle, plaintiffs must comply with the Court's pronouncement; failure to establish all three elements of the *Gingles* threshold analysis defeats a § 2 claim. *Brewer v. Ham*, 876 F.2d 448, 451 (5th Cir.1989).

 If plaintiffs fulfill the requisite preconditions, the court next considers and evaluates the "totality of the circumstances" to determine whether the challenged electoral system impedes the ability of minority voters to elect representatives of their choice. *See* 42 U.S.C. § 1973(b); *Gingles*, 478 U.S. at 79, 106 S.Ct. at 2781, 92 L.Ed.2d at 65. In conducting its "totality of the circumstances" evaluation, the court considers specific factors from the Senate Judiciary Committee report on the 1982 Amendments to the Voting Rights Act. The derivation of the factors is, in part, traceable to *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973). *Gingles* endorses the seven *Zimmer* factors, which 5th Circuit courts use to determine whether electoral procedures are discriminatory. *Gingles*, 478 U.S. at 44, 106 S.Ct. 2752, 92 L.Ed.2d at 42; *Brewer*, 876 F.2d at 451. The factors are:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that political process;

(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder[s] their ability to participate effectively in the political process;

(6) whether political campaigns have been characterized by overt or subtle racial appeals;

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that, in some instances, may carry probative value are:

(1) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

(2) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.

*Gingles*, 478 U.S. at 44–45, 106 S.Ct. 2752, 92 L.Ed.2d at 43; *Brewer*, 876 F.2d at 451.

 Court review of the above factors is, by nature, a factual inquiry. *Gunn v. Chickasaw County, Mississippi*, 705 F.Supp. 315, 318 (N.D.Miss.1989). Collectively, the components provide a framework for the court to consider the evidence in preparation for its application of the "totality of the circumstances" test set forth in § 2(b) of the Voting Rights Act. Inherently flexible, the test does not require "that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles*, 478 U.S. at 45, 106 S.Ct. at 2763, 92 L.Ed.2d at 43. The all important question is whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected class] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." [12] *Id.*

12. While "[t]he extent to which members of [the] protected class have been elected to office

Along with its flexibility, however, the test carries certain limitations. *Gingles*, 478 U.S. at 46, 106 S.Ct. at 2764, 92 L.Ed.2d at 43, 44.

> First, electoral devices, such as at-large elections, may not be considered per se violative of § 2. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process. Second, the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation. Third, the results test does not assume the existence of racial bloc voting; plaintiffs must prove it.

*Id.* (Citations omitted). Having outlined the pertinent standards controlling its decision, the court turns its attention to the three preconditions of a § 2 claim, otherwise known as the *Gingles* threshold test.

### 1. The Preliminary Inquiry

#### a. Minority Group Size and Geographic Compactness

Blacks in Attala County are sufficiently large in number and geographically compact to conceivably constitute two super majority single member supervisor districts. In contrast to the current plan, plaintiffs' proposed substitute plan places the entire black population of Kosciusko in one district. According to the testimony of Victoria Caridas, plaintiffs' expert witness, "Blacks inside Kosciusko alone could form a super majority district," leaving a sufficient concentration of blacks in the southwestern corner of the county to comprise a second majority black voting age population supervisor district. She further testified that blacks in Attala County are sufficiently numerous to create one majority black justice court judge district. After reviewing the voting age population data, the court finds that plaintiffs meet the first prong of the threshold test.

#### b. Racial Bloc Voting

The two remaining prerequisites are complementary aspects of racial block voting. Racial bloc voting "exists where there is 'a consistent relationship between the race of the voter and the way in which the voter votes', or to put it differently, where 'black voters and white voters vote differently.'" *Gingles*, at 53, n. 21, 106 S.Ct. at 2768, n. 21, 92 L.Ed.2d at 48. Plaintiffs' and defendants' expert testimony on racial bloc voting patterns varies considerably. Plaintiffs' expert, Cheri McKinless, utilized two standard statistical methods which *Gingles* discussed: ecological regression and extreme case analysis. Through ecological regression analysis, McKinless examined the behavioral differences between whites and blacks in voting and turnout. To determine voter preference for either a black candidate or a white candidate, McKinless relied on extreme case analysis. This methodology essentially compares the strength of a black candidate's performance in heavily black precincts, with the amount of support received in predominantly white precincts. In conducting her analysis, McKinless relied on precinct level election returns for racially mixed (white v. black) political contests between 1979 and 1991. Ideally, statisticians prefer homogenous precincts with a 90% voting age population for conducting extreme case analysis. The most heavily black precinct in Attala County, however, the Northeast precinct in District 2, has but a 71.81% black voting age population according to 1990 legislative precinct data. Due to the absence of any black precincts in Attala County with a suitable percentage, McKinless relied solely on precincts with at least an 80% white majority voting age population for her extreme case analysis tabulations. She testified that black candidates with white opponents received only marginal support in predominantly white precincts. In the thirteen elections sampled,[13] black candidates running

---

in the state or political subdivision is one circumstance which may be considered[,] ... nothing [in the Voting Rights Act] establishes a right to have members of a protected class elected in

numbers equal to their proportion in the population." 42 U.S.C. § 1973(b).

**13.** Of noteworthy significance *is the high amount of white voter support—59%—which*

against white opponents, on an average, garnished approximately 12% of the white votes cast in heavily white precincts of Attala County. The results of her extreme case analysis, plaintiffs' expert concluded, indicate a "strong association between race and voting." The court is unimpressed. Little value can be found in an extreme case analysis that does not consider two extremes: white precincts and black precincts. Without containing any heavily black precincts, plaintiffs' analysis is incomplete; it sheds no light on, and offers little proof of, black political cohesiveness. Nor does it hint of any preferred candidate of choice among blacks. Plaintiffs' analysis essentially presumes that the greater support for white candidates among whites voting in heavily white precincts is sufficient to demonstrate that whites vote as a bloc to defeat the preferred candidate of blacks. Such presumptions are unacceptable. It, by no means, is a forgone conclusion that blacks vote only for blacks in black vs. white elections. To presume that black voters are beholden to black candidates does the minority group an injustice and makes a travesty of the Voting Rights Act.

An equally unfair presumption is that only black candidates represent, share, and appeal to the concerns of the black electorate. Attala County black voters and, in fact, black voters in general, are capable of ousting or rejecting a black candidate in favor of a white candidate, whom they view as better meeting the needs of the people. Factors such as a candidate's experience, qualifications, education and contact with the electorate are of much greater significance than race to voters in Attala County, or elsewhere for that matter, be they black or white. "Race won't keep you from getting elected," as the supervisor of district three, Troy Hodges, related during trial. Hodges, whose district sits deep within the black area of Kosciusko, described his experiences of campaigning for votes and support from his black constituents, whom he described as crucial to his victory.

When asked whether blacks "are single-minded," he responded, "No." It has been his experience that "blacks won't vote for a candidate just because [the candidate] is black or white."

Further evidence in the record reinforces this notion of black crossover voting. White candidates have received substantial support from voters in majority black precincts. For instance, in the September 27, 1991, first primary election, five candidates—four white and one black—were vying for sheriff. In the Sallis precinct of District Four, the presently existing black super majority district, there is a total black majority voting age population of 564 or 61.50%; the white voting population is only 353 or 38.50%. Five hundred and eighty-five votes were cast for the four white candidates. Assuming that the entire 353 white voters supported white candidates (which is doubtful), this still leaves a minimum of 232 black crossover votes. Similarly, in the constable east district primary election of August 1987, the black candidate, Michael Lee, received 96 votes from the McCool precinct. If all 96 votes for Lee are attributed to blacks, the measurement of black voter turnout is 88.10%, a highly unlikely proposition, given blacks' historically low voter turnout. In fact, plaintiffs' own expert estimates a 12% level of black voting age population participation in this primary. Given the low percentage black turnout, the chances are highly probable that some of the 96 votes for Lee in the McCool precinct were cast by whites. Lack of black political cohesion, it seems, accounted for his loss, not white animosity. There is no indication that Lee's defeat was in any way due to a concentrated effort on the part of whites to solidify and exercise a bloc vote to thwart the election prospects of a black candidate, who, for that matter, did not even appear to have particularly strong minority support. With so little minority backing, Lee hardly could be called the candidate of choice among blacks. To suggest that blacks are driven solely by

then incumbent black Judge Reuben Anderson received to defeat an avowed segregationist, Richard Barrett, in the racially charged Missis-

sippi Supreme Court 1986 Democratic primary election.

race and, therefore, committed to casting their votes for only black candidates, besides taking their vote for granted, is a misapplication of the Voting Rights Act. "Under § 2, it is the status of the candidate as the *chosen* representative of a particular racial group, not the *race* of the candidate that is important." *Gingles,* 478 U.S. at 68, 106 S.Ct. at 2775, 92 L.Ed.2d at 58. The Voting Rights Act never was intended as a vehicle for creating "safe" black or other minority seats. As is evident from the express statutory language, "[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in population." 42 U.S.C. § 1973(b).

### 2. The Ultimate Inquiry

Although plaintiffs fail to meet the initial requirements of a § 2 claim, the court, nevertheless concludes that, even if they had been successful in the preliminary stage, in view of the "totality of the circumstances," blacks have the same "opportunity ... to participate in the political process and ... elect representatives of their choice." 42 U.S.C. § 1973. "[T]he political processes leading to nomination or election in [Attala County] are ... equally open to [black and white] participation...." *Id.* This is evident from the number of black candidates ultimately elected to public office by black and white voters alike. Further evidence of black electoral involvement can be found in political contests between white candidates. Indeed, the black vote is heavily sought after in Attala County; election outcomes often turn on how blacks vote.

While black candidates have met with success, they have also experienced defeat. Some positions, they simply have never sought. Further redistricting of Attala County, however, is certainly no guarantee of additional black candidate victories. If, hypothetically, the court were to order implementation of a new voting scheme that "still fail[ed] to produce [more] black winner[s]," the court can easily envision entertaining even further requests to "mandat[e] [alternate] designs which seg-

regate blacks into greater and greater concentrations until at last a black is elected[.]" *Houston v. Haley,* 859 F.2d 341, 343 (5th Cir.1988). Adopting such a course would directly contravene the Voting Rights Act. The purpose of the Voting Rights Act was to eradicate impediments designed to deny blacks (and other protected groups) the right to vote and participate in the political process. Plaintiffs equate the failure of a black candidate to emerge from a political contest as the winner with denying blacks effective political participation. Such contentions are an aberration of the legislative intent behind the Voting Rights Act. The landmark legislation sought to ensure political participation, not proportional representation. 42 U.S.C. § 1973; *Houston,* 859 F.2d at 343–344. Political participation, in the context of the Voting Rights Act, means equal access to the political process of launching a winning campaign and ultimately producing a successful candidate who represents "all citizens, not just a particular faction." *Id.* at 344. Congress foresaw a political process in which a variety of groups, through bargaining and negotiating, formulated strong power bases and built coalitions to maximize voter potential so that everyone's vote counted in the political arena.

Voter registration levels are comparatively the same for black and white Mississippians. According to Census Bureau information, 70.8% of whites and 71.4% of blacks in Mississippi were registered to vote in the 1990 Congressional election. The ecological regression analysis offered by plaintiffs as evidence of the difference between voting behaviors of blacks and whites is nondemonstrative of a minority vote dilution claim. The feeble explanations which plaintiffs offer for the lower voter turnout among blacks as compared with whites are unpersuasive. To say the improvements blacks have experienced over the last ten years are merely "adequate" severely underestimates the substantial ground traveled on the journey toward equality. The Census figures are a strong indication of the remarkable inroads blacks have made in areas where, historically, they had encountered discriminatory

treatment. At the very least, the numbers are encouraging. In virtually every aspect, the quality of life for blacks, as a segment of American society, continues on an upward trend.

As already demonstrated in Attala County, political office is no longer out of reach for blacks Americans. The parties stipulated in the pretrial order to the lack of a candidate slating process in Attala County. There is no evidence that campaign strategies in Attala County carry any degree of overt or subtle racial appeals. Rather than unequal electoral opportunity, the source of minority candidate defeat can be traced to the failure to energize an apathetic electorate. Voter apathy afflicts society in general, transgressing every socio-economic level and knowing no barriers. Political victories are the fruit of organizing, energizing and mobilizing an electorate to turn out and vote for a particular candidate. Rather than to the federal judiciary, plaintiffs should turn to the ballot box for increased political power. The recipe for greater political clout is "running candidates and turning out to vote." *Salas v. Southwest Texas Junior College District,* 964 F.2d 1542, 1555 (5th Cir.1992).

## B. CONSTITUTIONAL CLAIM

■■■■ Similarly insubstantial is the constitutional claim which plaintiffs advance. The current district plans are nonviolative of the one person one vote principle underlying the U.S. Constitution. When Census data is incorporated to the existing supervisory plan using the actual boundaries currently in place, the population deviation, 9.54%, is minor; since it falls within the permissible margin—below the ten percent threshold—the maximum population deviation of the 1983 redistricting plan for Attala County comes under the "category of minor deviations." *Brown v. Thomson,* 462 U.S. 835, 842, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214, 222 (1983) (citations omitted). "Minor deviations from mathematical equality ... are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment...." *Brown v. Thomson,* 462 U.S. 835, 842, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214, 221 (1983) (*quoting Gaffney v. Cummings,* 412 U.S. 735, 745–748, 93 S.Ct. 2321, 2327–29, 37 L.Ed.2d 298 (1973), which describes various difficulties in population measurements). De Minimis deviations are unavoidable, permissible, and necessary to keep political subdivisions functional. *Brown,* at 842, 103 S.Ct. at 2695, 77 L.Ed.2d at 221. "[M]aintaining the integrity of various political subdivisions" is a legitimate objective of state government. *Brown,* 462 U.S. at 842, 103 S.Ct. at 2696, 77 L.Ed.2d at 221. Avoiding disruption of the precinct structure shaping Attala County's supervisory districts is one such legitimate state concern; one which plaintiffs' expert, Victoria Caridas, admittedly disregarded in drawing proposed "model" districts to replace the 1983 plan presently in place. Even if the deviation amounted to, as plaintiffs assert, a figure of 14%, the current plan is constitutionally valid, given defendants' legitimate concerns regarding the county's precincts. *See Jenkins v. Pensacola,* 638 F.2d 1249, 1255 (5th Cir. 1981) (14% deviation constitutionally permissible to avoid "undue distortion of precinct lines and contiguity").

The preservation of existing road mileage formulas to facilitate distribution of county funds under the current beat system of local county government was also recognized by Caridas as a valid state objective; however, it, too, was not considered in her "model" district formulations. Supervisors derive spending autonomy from a beat system of government, under which county funds go directly to individual supervisors. In contrast to the beat system, the unit system of government requires supervisors to contend with a central authority. As the former supervisor of the county's black majority district, Jesse Fleming, testified that individual control over funding allotments allows supervisors to better serve their respective constituencies. Attala County voted in favor of the beat system over the unit system in 1988, with substantial support coming from Fleming's district.

## IV. CONCLUSION

In considering the record before it, the court finds that plaintiffs have not shown

**406**

blacks in Attala County to be politically cohesive; nor have they proved that whites vote as a bloc to defeat minority candidates. Even assuming the inverse, the court concludes that neither of plaintiffs' claims is viable. The current district plans neither dilute black voting strength nor deny blacks equal access to the political process in violation of § 2 of the Voting Rights Act. Besides lacking a vote dilution claim, plaintiffs' action is devoid of a viable "one person one vote" constitutional claim.

An order in accordance with this memorandum opinion shall be entered.