Beatrice HOUSTON, Annie Ruth Manning, and Mary Ann Williams, Plaintiffs,

v.

LAFAYETTE COUNTY, MISSISSIPPI, Lafayette County Democratic Executive Committee (by and through its Chairman, Ron Lewis), Ronald W. Lewis, Chairman for Lafayette County Democratic Executive Committee, Lafayette County Republican Executive Committee (by and through its Chairwoman Kay Cobb), Kay Cobb, Chairwoman for Lafayette County Republican Executive Committee, Lafayette County Election Commission (by and through its Chairwoman Sherry Tatum, and Sherry Tatum, Chairwoman for Lafayette County Election Commission), Defendants.

Civ. A. No. 3:91CV108–D–D.

United States District Court, N.D. Mississippi, W.D.

Nov. 3, 1993.

Ellis Turnage, Cleveland, MS, for plaintiffs.

David O'Donnell, Hickman, Goza and Gore, Oxford, MS, for defendants.

### MEMORANDUM OPINION

DAVIDSON, District Judge.

## I. INTRODUCTION

The political landscape of Lafayette County, Mississippi is the focus of this lawsuit premised primarily on an alleged § 2 violation of the monumental Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973, et seq. Today's result stems from an exhaustive analysis of election results, electoral demography and composition, voting patterns, concentrations, habits, practices and behavior,

and statistical methodology. The seminal case, *Thornburg v. Gingles,* 478 U.S. 30, 36–38, 106 S.Ct. 2752, 2759–2760, 92 L.Ed.2d 25 (1986) and the recent Supreme Court case and decision, *Shaw v. Reno,* —— U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993), provide the underlying law and authority for the court's legal discussion. After an extensive study and review of the oral and documentary evidence received during the course of a four day nonjury trial, over which the undersigned presided in Oxford, Mississippi, the parties' subsequent and supplemental filings of proposed findings of fact and conclusions of law, and the entire court file as maintained by the office of the clerk of this United States district court, the undersigned district judge herein renders the following decision: The voting rights and powers of the minority population resident within Lafayette County, Mississippi, have not been infringed upon by Defendants under either the previously or currently governing plan. Minority vote dilution simply is not a consequence of the existing district plan now operative in Lafayette County, Mississippi. Thus, the asserted claim of a § 2 violation must fail.

## II. FINDINGS OF FACT

### A. *THE DEMOGRAPHICS*

Lafayette County, north centrally located in Mississippi, is home to the city of Oxford and the University of Mississippi. Oxford contains a population of 9,984 residents of which, 8,100,[1] or 81.13%, are white or of other ethnic origin; 1,884, or 18.9%, are black. Nearly one-third of the county's total population resides within Oxford. Outside of Oxford, the county seat, the area is primarily rural. The 1980 Census reported a total population of 31,030 in Lafayette County, Mississippi. Blacks accounted for 8,184, or 26.4%, while whites along with others represented the remaining 22,846, or 74%. The 1990 Census reported a total county population numbering 31,824 (rather than 31,826, the number stated in the pre-trial order), a precise increase from 1980 of 2.55889%, or 794 individuals. Using 1990 census statistics, the overall percentage breakdown reflects a racial composition of approximately 25% black and 75% white.

It is noted that the Plaintiffs have filed a post trial motion requesting findings of fact and conclusions of law relative to treatment of the student population at the University of Mississippi. The Plaintiffs averred that 3934 persons included in the 1990 census data were students at the University. In the court's opinion, after a careful review of the evidence, there was no proof presented that would support a finding relative to any distinguishing factors concerning voter registration and/or participation by those included in the census as residents of the University of Mississippi.

The black population, rather than concentrated in one specific voting district, is dispersed throughout the county's five supervisory districts. As such, blacks as a segment of the population do not comprise a majority of voters in any one voting district. Plaintiffs contend that the present district scheme effectively prohibits blacks residing within Defendant county from electing a black candidate of their choice to hold the office of county supervisor in any of the five single member supervisory districts. To enhance their chances of electing a black supervisor, Plaintiffs advocate the creation of a majority black minority voting-age population district for Lafayette County, Mississippi.

As do other counties in Mississippi, Lafayette County elects its county board of supervisors and board of election commissioners from five separate and distinct supervisory districts of nearly the same size in population. *Teague v. Attala County,* 807 F.Supp. 392, 396 (N.D.Miss.1992). Prior to January 1, 1984, five justice court judges and constables were elected in Lafayette County from the five supervisory districts. Subsequent to January 1, 1984, two constables and justice court judges have been elected in Lafayette County from the Northern and Southern Districts. Miss.Code Ann. §§ 9–11–2, and 19–19–2 (Cumm.Supp.1992). Among the five districts contained within Lafayette County under the current plan dated April 16, 1991, the fourth district is the most populous

---

1. The pretrial order contains a typographical error that misstates the white/nonblack population as 8,810.

(6,433); the second district claims the least number of residents (6,297) as shown in the chart below.

1. CURRENT PRECLEARED LAFAYETTE COUNTY SUPERVISORY REDISTRICTING PLAN INCORPORATING 1990 CENSUS DATA

| DIST. | TL. POP./(%) | BLACKS/(%) [2] | WHITES/(%) |
|---|---|---|---|
| 1 | 6,377/20.00 | 1,683/26.4 | 4,694/73.6 |
| 2 | 6,297/20.00 | 1,563/24.8 | 4,734/75.2 |
| 3 | 6,369/20.00 | 2,205/34.6 | 4,164/65.4 |
| 4 | 6,431 [3]/20.00 | 2,404/37.4 | 4,027/62.6 |
| 5 | 6,350/20.00 | 818/12.9 | 5,532/87.1 |
| Total | 31,824 [4] | 8,673/27.3 | 23,151/72.7 |

Calculation of the population deviation percentage using the above 1990 figures produces a 2.11% maximum deviation. The relevant computation formula may be expressed via the following equation:

$$\frac{(\text{most pop. dist.} - \text{avg. pop.})}{\text{avg. pop.}} + \frac{(\text{avg. pop.} - \text{least pop. dist.})}{\text{avg. pop.}} = \% \text{ dev.}$$

$$\frac{(6,431 - 6,365)}{6,365} + \frac{(6,365 - 6,297)}{6,365}$$

$$\frac{66}{6,365} + \frac{68}{6,365} = 2.11\%$$

$$1.04\% + 1.07\% = 2.11\%$$

The 1991 elections for county offices were conducted under a redistricting plan based on 1980 census data. When 1991 census data is applied to the plan used in the 1991 elections, it produces the following results:

| DIST. | TL. POP./(%) | BLACKS/(%) | WHITES/(%). | OTHER/(%) | % Dev. |
|---|---|---|---|---|---|
| 1 | 6,120/19.20 | 1,585/25.9 | 4,489/73.4 | 46/.8 | (3.85%) |
| 2 | 6,203/19.50 | 1,471/23.7 | 4,623/74.5 | 109/2 | (2.55%) |
| 3 | 6,720/21.11 | 2,179/32.4 | 4,480/66.7 | 61/.9 | 5.60% |
| 4 | 6,703/21.06 | 2,087/31.1 | 4,231/63.1 | 385/6 | 5.31% |
| 5 | 6,080/19.10 | 658/10.8 | 5,328/87.6 | 94/2 | (4.50%) |
| Total | 31,826/99.97 | 7,980/25.1 | 23,151/72.7 | 695/2.2 | 10% |

Defendant Lafayette County, acting through its elected board of supervisors, enlisted the professional services of Three Rivers Planning and Development District ("Three Rivers") to prepare a redistricting plan consistent with 1990 census data. The county specified particular criteria for Three Rivers to follow: (1) the voting strength of all minorities within the county should not be diluted or diminished either through packing or fragmentation; (2) the population deviation should be maintained at 5% or less; (3)

2. The numerical and percentage figures express the amount of "blacks + other minorities" within each district.

3. The pre-trial order states a total population of 6,433 in district four. To correct what appears to be a minor discrepancy in the figure, the court reduces the figure to 6,431, the sum of the white and black figures for district four: 4,027 + 2,404 = 6,431.

4. The total voting age population of Lafayette County, Mississippi reflected in the 1990 census tally is 25,217, of which 19,287, or 76.5%, are white, and 5,330, or 21%, are black; of the remaining 600, 558 are of Asian extraction.

no incumbent supervisor should be placed in a supervisor district with another incumbent supervisor; (4) where possible, present voting precincts were to be preserved; and (5) equalization of road mileage and bridge maintenance within each district should be achieved.

2. PLAINTIFFS' PROPOSED ALTERNATIVE REDISTRICTING PLANS WITH A MAJORITY MINORITY DISTRICT USING TOTAL POPULATION DATA

Plan "B" (P–38)

| DIST. | TL. POP./(%) | "%" Dev. | BLACKS/(%) | W + O/(%) |
|---|---|---|---|---|
| 1 | 6,419/20.20 | .85% [5] | 1,038/16 | 5,381/84 |
| 2 | 6,448/20.30 | 1.30% [6] | 1,419/22 | 5,029/78 |
| 3 | 6,226/19.60 | (2.18%) | 3,719/60 | 2,507/40 |
| 4 | 6,407/20.10 | .66% | 1,318/20.60 | 5,089/79.4 |
| 5 | 6,326/19.90 | (.61%) [7] | 486/ 7.70 | 5,840/92.3 |
| Total | 31,826 | 3.48% [8] | 7,980/25. | 23,151/72.7 |

Plan "A" (P–14)

| DIST. | TL. POP./(%) | "%" Dev. | BLACKS/(%) | WHITES/(%) |
|---|---|---|---|---|
| 1 | 6,292/20.00 | (1.15%) | 3,879/61.65 | 2,401/38.16 |
| 2 | 6,209/20.00 | (2.45%) | 1,489/24 | 4,703/75.75 |
| 3 | 6,586/21.00 | 3.47% | 989/15 | 5,562/84.45 |
| 4 | 6,366/20.10 | .02% | 937/14.7 | 4,963/78 |
| 5 | 6,373/19.90 | .13% | 686/10.76 | 5,522/86.65 |
| Total | 31,826 | 5.92% [9] | 7,980/25 | 23,151/72.7 |

---

**5.**

$$\frac{\text{dist. pop.} - \text{avg. pop.}}{\text{ideal dist. size}} = \% \text{ dev. per district}$$

$$\frac{6,419 - 6365.2}{6,365.2} = \frac{53.80}{6,365.2} = .85\% \text{ (P–38 lists dev. \% of .84\%)}$$

**6.**

$$\frac{\text{dist. pop.} - \text{avg. pop.}}{\text{ideal dist. size}} = \% \text{ dev. per district}$$

$$\frac{6,448 - 6365.2}{6,365} = \frac{82.8}{6,365.00} = 1.30\% \text{ (P–38 lists a 1.34\% dev.)}$$

**7.**

P–38 erroneously lists this percentage as a positive figure.

**8.**

$$\% \text{ dev.} = \frac{\text{most pop. dist.} - \text{avg. pop.}}{\text{avg. pop.}} + \frac{(\text{avg. pop.} - \text{least pop. dist.})}{\text{avg. pop.}}$$

$$\frac{(6,448 - 6,365)}{6,365} + \frac{(6,365 - 6,226)}{6,365}$$

$$\frac{83}{6,365} + \frac{139}{6,365} = 3.48\%$$

$$1.30\% + 2.18\% = 3.48\%$$

**9.**

$$\% \text{ dev.} = \frac{\text{most pop. dist.} - \text{avg. pop.})}{\text{avg. pop.}} + \frac{(\text{avg. pop.} - \text{least pop. dist.})}{\text{avg. pop.}}$$

$$\frac{(6,586 - 6,365)}{6,365} + \frac{(6,365 - 6,209)}{6,365}$$

$$\frac{221}{6,365} + \frac{156}{6,365} = 5.92\%$$

$$3.47\% + 2.45\% = 5.92\%$$

3. PLAINTIFFS' PROPOSED ALTERNATIVE REDISTRICT-
ING PLANS WITH A MAJORITY BLACK MINORITY DIS-
TRICT USING TOTAL VOTING AGE POPULATION DATA

Plan "B" (P-38)

| DIST. | Tl. VAP/(%) | BVAP/(%) | W + O VAP/(%) |
|---|---|---|---|
| 1 | 5,398/21.40 | 754/14 | 4,644/84 |
| 2 | 4,958/19.70 | 943/19 | 4,015/78 |
| 3 | 4,331/ 19.60 | 2,335/ 54 | 1,996/ 40 |
| 4 | 5,011/ 17.20 | 912/ 18.2 | 4,099/ 79.4 |
| 5 | 5,519/ 21.90 | 386/ 7.00 | 5,133/ 92.3 |
| Total | 25,217/ 99.8 | 5,330/ 21. | 19,877/ 78.9 |

Plan "A" (P-14, P-15)

| DIST. | Tl. VAP/(%) | BVAP/(%) | WVAP/(%) |
|---|---|---|---|
| 1 | 4,484/ 17.78 | 2,493/ 55.60 | 1,980/ 44.16 |
| 2 | 4,610/ 18.28 | 948/ 20.56 | 3,645/ 79.07 |
| 3 | 4,864/ 19.29 | 631/ 12.97 | 4,208/ 86.51 |
| 4 | 5,644/ 22.38 | 712/ 12.62 | 4,525/ 80.17 |
| 5 | 5,615/ 22.27 | 546/ 9.72 | 4,929/ 87.78 |
| Total | 25,217/100 | 5,330/ 21. | 19,287/ 78.9 |

---

## B. *BLACK ELECTORAL SUCCESS IN LAFAYETTE COUNTY, MISSISSIPPI*

Black candidates have sought and won election to public office in Lafayette County by garnishing support from both the black and white electoral body. In twenty-four key elections, a minority preferred candidate was elected in sixteen instances, or 66.7% of the time. Included among a subsection of six victories over a nine year period (1982–1991) is the outcome of the runoff race for constable in district three, August 23, 1983, and in subsequent elections in the northern constable and justice court judge district. Blackmon qualified for the runoff as one of two black candidates who ran in a three way primary race, August 2. He received the highest number of votes, 854. The other black candidate, Peter Johnson, received the second highest number, 255, but he trailed far behind Blackmon by almost 600 votes. The third choice (the only white candidate), Michael T. Chesteen, received the least number of votes, 245, or ten less than Johnson. In the runoff, Blackmon received 828 more votes than his opponent Johnson. After beating Johnson, Blackmon faced no opposition in the November 1983 general election. The election was held under the existing state law that provided for the election of constables in each of the five supervisory districts.

Approximately four years later, Blackmon emerged from the August 4, 1987 primary race for constable in the northern district as the top vote recipient again with a total of 2,130 or 47.3% of the 4,499 votes exercised.[10] His strong performance in the primary carried him to the runoff where he faced a

10.

| Robert Blackmon | | | | remaining primary candidates | | | |
|---|---|---|---|---|---|---|---|
| 2,130 | = | X% × 4,499 | | 2,369 | = | X% × 4,499 | |
| $\frac{2,130}{4,499}$ | = | 4,499(X) × | $\frac{1}{4,499}$ | $\frac{2,369}{4,499}$ | = | 4,499(X) × | $\frac{1}{4,499}$ |
| 47.3% | = | X | | 52.7% | = | | X |

white, male opponent, Lee Allen. Running opposite a white candidate, however, did not present a hindrance to Blackmon; he received 59% of the votes cast. In the November general election Blackmon once more had the advantage of no opposition; he was elected to public office as constable for the northern district with 3,366 votes in an uncontested general election.

Blackmon's winning streak continued through the general election of November 6, 1991, at which time he defeated his white opponent, Jerry P. (Bubba) Mize, and retained the post of constable for the northern district. Sixty-one percent of the vote went to Blackmon, the black candidate, and the remaining 39% was claimed by the white opponent.[11]

In marked contrast to these victories, Blackmon's earlier tries resulted in defeat. Although initial attempts to hold office as constable for district three proved unsuccessful, they were an indication of Blackmon's viable candidacy. For instance, in the August 7, 1979 primary race for the constable position, Blackmon suffered a narrow defeat of ten percentage points; he managed to capture 45% of the total votes cast. A later run for the office resulted in an even closer defeat when Blackmon lost to the opposing, white candidate, Bobby L. Gore, by just eight votes in the special election of April 7, 1981.

Blackmon's preliminary runs for office, while unsuccessful when viewed in a vacuum, apparently held the key to his future political success and later prominence. Presumably, Blackmon's earlier runs increased his name recognition and voter identification rate among the voting public.

William L. Buford, another black politician in the county, succeeded in winning a contested 1988 general election conducted on November 3, 1988.[12] He defeated a white female, Jane B. Thomas, and secured a seat on the school board governing district three. Buford mustered 58% of the 805 votes cast in that election. In a prior general election, November 2, 1982, Buford's campaign for the same office (school board member from district three) resulted in a victory against his white opponent Sherwin Haynie. Haynie re-

**11.**

Robert Blackmon

$$2,422 = X\% \times 3,972$$

$$\frac{2,422}{3,972} = \frac{3,972}{} (X) \times \frac{1}{3,972}$$

$$61\% = X$$

Jerry P. (Bubba) Mize

$$1,550 = X\% \times 3,972$$

$$\frac{1,550}{3,972} = 3,972(X) \times \frac{1}{3,972}$$

$$39\% = X$$

$$61\% + 39\% = 100\%$$

**12.**

William Buford

$$463 = X\% \times 805$$

$$\frac{463}{805} = 805(X) \times \frac{1}{805}$$

$$57.5\% = X$$

Jane B. Thomas

$$342 = X\% \times 805$$

$$\frac{342}{805} = 805(X) \times \frac{1}{805}$$

$$42.5\% = X$$

$$57.5\% + 42.5\% = 100\%$$

ceived 45.2% of the votes cast, while Buford collected 54.8%.[13]

Unlike Blackmon, political defeat fell upon William L. Buford after he had experienced electoral success. After winning a seat on the school board as a member from district three, Buford mounted an unsuccessful campaign in 1987 for election to office as county supervisor for district three. Although he ultimately lost to his white opponent, Thomas Ray Gunter, by 611 votes, Buford made a respectable showing by winning 30% of the actual vote.

Besides Buford's try for a supervisor's seat, there have been other, similar attempts that also have resulted in political defeat. To date, no black has ever held public office as district supervisor in Lafayette County. Concurrent with Buford's 1987 run for supervisor in district three, another black versus white runoff election contest for the office of supervisor was occurring in district two. The black candidate, Warren "Mickey" Bruce, opposed incumbent, Clark Littlejohn. Bruce captured a sizeable portion of support—47% of the total votes cast—even though he had to contend with Littlejohn's longstanding incumbency. He fell short of a victory by just four percentage points. His white opponent retained the seat with only an additional 121 votes.

In the same year, 1987, another black candidate, Ollie Redmond, Jr., met a similar defeat when he faced a white opponent, Jim Q. Tatum, Jr., in the runoff for supervisor of district four. In the primary which forced this runoff, Tatum, one of the six white candidates, received 446 votes; Redmond, one of two black candidates running in the primary, emerged with 344 votes, a difference of 102. Redmond, with the second highest number of primary votes, advanced to the runoff, which

he would lose to Tatum, his white opponent who had received the greatest number of votes in the primary race.

At the primary stage, roughly 70% of the vote was sufficiently split among the six white candidates. The remaining 30% was distributed between Redmond and the other black candidate, Van Lee Wortham. Had Redmond received 103 of Wortham's 195 votes, he would have emerged from the primary with the most votes ahead of Jim Q. Tatum, Jr. Although a runoff still would have followed, Redmond would have stood in a stronger position as the primary candidate with the most votes.

Notwithstanding Redmond's defeat, his performance was stronger than in his previous election battle with the same opponent four years earlier, 1983. Redmond lost to Tatum in the 1983 general election for supervisor of district four by 505 votes or 36%; Redmond picked up 32% compared with 68% for Tatum. In the 1987 runoff for supervisor of district four, the gap between them narrowed significantly to 218 votes. Although Redmond again lost, his voter support grew by more than ten percentage points from 32% to 42.5%. Meanwhile, Tatum's performance diminished by a near equivalent amount from 68% to 58%. These same two candidates opposed each other again in the 1991 primary, but this time the office each sought was supervisor of district three, rather than district four. Despite running in a different district, Redmond sustained support of 42.3% against Tatum's 57.7% voter backing. The difference between the number of votes each received narrowed further to 200.

The 1991 primary race for supervisor of district four still involved a black versus white race, but rather than Tatum and Red-

13.

| William Buford | | | | Sherwin Haynie | | | |
|---|---|---|---|---|---|---|---|
| 442 | = | X% × 806 | | 364 | = | X% × 806 | |
| $\dfrac{442}{806}$ | = | 806(X) × | $\dfrac{1}{806}$ | $\dfrac{364}{806}$ | = | 806(X) × | $\dfrac{1}{806}$ |
| 54.8% | = | X | | 42.5% | = | X | |
| | | 54.8% + 45.2% | | | = | 100% | |

mond, the candidates were Warren "Mickey" Bruce and Clark Littlejohn. Bruce, the black candidate, won 42% of the vote. Bruce's white opponent, Littlejohn, matched the 58% support which his predecessor Tatum received in the 1987 runoff.

The upward trend in support behind Redmond and other black candidates suggests growing participation among blacks in the voting process and/or crossover voting by whites for a black candidate. Either explanation could account for the increase in support Redmond received between 1983 and 1987. Either he succeeded in cutting into Tatum's support, or he activated and energized a previously dormant segment of the electorate. A comparison between the ecological regression weighted analyses from the 1983 general election and the 1987 democratic runoff for district four supervisor tends to suggest a defection of black support from Tatum to Redmond. Black support for Tatum (the white candidate) dropped from 87.6% in the 1983 general election to 62.1% in the 1987 democratic runoff. By contrast, black support for the black candidate increased from 12.4% to 37.9%. The sharp rise denotes a viability in black candidacies for district supervisor and other Lafayette county public offices. The same opportunities for participating in the political process apparently are open and available to all eligible members of the electoral body, black and white alike.

## III. CONCLUSIONS OF LAW

■ As with any complaint of a § 2 violation, the court preliminarily addresses whether Plaintiffs meet the Supreme Court's pronouncement of a tripartite test in the case of *Thornburg v. Gingles*, 478 U.S. 30, 36, 37, 106 S.Ct. 2752, 2759–2760, 92 L.Ed.2d 25, 38 (1986). The three critical factors which Plaintiffs must demonstrate to advance a § 2 claim are: (1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single member district; (2) that the minority is politically cohesive; and (3) "that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—

usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50–51, 106 S.Ct. 2752 at 2766–67, 92 L.Ed.2d at 46–7.

■ As an initial hurdle, Plaintiffs must comply with the Court's pronouncement; failure to establish all three elements of the *Gingles* threshold analysis is fatal to a § 2 claim. *Brewer v. Ham*, 876 F.2d 448, 451 (5th Cir.1989). If, alternatively, Plaintiffs fulfill the requisite preconditions, the court next considers and evaluates the "totality of the circumstances" to determine whether the challenged electoral system impedes the ability of minority voters to elect representatives of their choice. *See* 42 U.S.C. § 1973(b); *Gingles*, 478 U.S. at 79, 106 S.Ct. at 2781, 92 L.Ed.2d at 65.

■ In conducting its "totality of the circumstances" evaluation, the court considers specific factors from the Senate Judiciary Committee report on the 1982 amendments of the Voting Rights Act. The derivation of the factors is, in part, traceable to *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973). *Gingles* endorses the seven *Zimmer* factors which 5th Circuit courts use to determine whether electoral procedures are discriminatory. *Gingles*, 478 U.S. at 44, 106 S.Ct. 2752 at 2763, 92 L.Ed.2d at 42; *Brewer*, 876 F.2d at 451. The factors are:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that political process;

(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder[s] their ability to participate effectively in the political process;

(6) whether political campaigns have been characterized by overt or subtle racial appeals;

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that, in some instances, may carry probative value are:

(1) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

(2) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice, or procedure is tenuous.

*Gingles,* 478 U.S. at 44–45, 106 S.Ct. 2752 at 2763, 92 L.Ed.2d at 43; *Brewer,* 876 F.2d at 451.

 Court review of the above factors is, by nature, a factual inquiry. *Gunn v. Chickasaw County, Mississippi,* 705 F.Supp. 315, 318 (N.D.Miss.1989). Collectively, the components provide a framework for the court to consider the evidence in preparation for its application of the "totality of the circumstances" test set forth in § 2(b) of the Voting Rights Act. Inherently flexible, the test does not require "that any particular number of factors be proved, or that a majority of them point one way or the other." *Gingles,* 478 U.S. at 45, 106 S.Ct. 2752 at 2763, 92 L.Ed.2d at 43. The all important question is whether "the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [protected class] ... in that its members have less opportunity than other members of the electorate to participate in the political pro-

cess and to elect representatives of their choice." [14] *Id.*

Along with its flexibility, however, the test carries certain limitations. *Gingles,* at 46, 106 S.Ct. at 2764, 92. L.Ed.2d at 43, 44.

 First, electoral devices, such as at-large elections, may

not be considered per se violative of § 2. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process. Second, the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation. Third, the results test does not assume the existence of racial bloc voting; plaintiffs must prove it.

*Id.* (Citations omitted). Having outlined the pertinent standards controlling its decision, the court turns its attention back to the three preconditions of a § 2 claim, otherwise known as the *Gingles* requisite threshold test.

## A. THE PRELIMINARY INQUIRY AND THRESHOLD TEST

### 1. MINORITY GROUP SIZE AND GEOGRAPHIC COMPACTNESS

 Plaintiffs' expert witness from the Southern Regional Council Voting Rights Project, Victoria Caridas, testified that blacks within Lafayette County constituted a sufficiently large population segment for the creation of a majority minority district. In her estimation, it would require at least 3,819 of the 8,673 (approximately 44% of the Defendant county's black minority population) to produce a 56%–60% majority minority supervisory district. To accomplish this, she envisions blending portions of the two districts holding the heaviest minority concentrations with other voting-age blacks from the three remaining districts.

The two districts with the greatest minority percentages under the current operative

---

**14.** While "[t]he extent to which members of [the] protected class have been elected to office in the State or political subdivision is one circumstance which may be considered[,] ... nothing [in the Voting Rights Act] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b).

plan are district three with 34.6% and district four with 37.4%. By dividing the minority voting-age population between two supervisory districts, the current plan, according to Ms. Caridas' characterization, weakens and dilutes minority voting strength by "fragmenting" or "cracking" populated areas holding heavy minority concentrations into two separate, adjacent, less effective districts. Rather than dividing these concentrations between two supervisory districts, Caridas advocates merging the precincts with the heaviest black concentrations in district three—College Hill and Abbeville—with those contained in district four: Oxford four, Burgess, and Taylor. As the Lafayette County map in evidence demonstrates, these precincts do in fact fall in a contiguous pattern. As such, they conceivably could be embraced within one supervisory district and augmented with similar surrounding sections, but even when linked to other nearby precincts with sizeable black constituencies, the combined, above-named precincts within district three and four remain short of Caridas' target figure by more than 1,000 black voters. To adjust the shortfall, Caridas reaches out to East Oxford and extracts black voters from the Oxford one precinct contained in supervisor district one. Changing direction, she moves upwards into North Oxford and taps into Oxford precinct two.

The maneuvers by which Caridas draws a district that favors some of the county's black minority population result in a lopsided, distorted, and disjointed geographic scheme. Jagged edges outline the minority district border that faces the northwest corner of the upper left quadrant of Lafayette County. The top diagonal portion of this quadrant takes on the shape of an aberrant triangle with several protrusions dipping into the top of the minority framed area. The placement of part of the proposed minority district in the bottom diagonal portion of the upper-left quadrant interrupts the fluidity of district lines by forcing an unlikely association between the extreme northwest section of Lafayette County with the upper-right quadrant and most of the top portion of the bottom-right quadrant. Plaintiffs' proposed redistricting plan "A" illustrates the absence of sufficiently large numbers and geographical compactness necessary to comprise a majority minority district.

Plan "B" is further confirmation of the want of enough blacks to assemble a practical, workable majority black supervisor district. Similar discordant and arbitrary annexations are noticeably present in Plaintiffs' second alternative plan (Plan "B") concocted to yield a yellow-coded 60% black voting-age majority in Lafayette County, Mississippi. Adrift within the blue-shaded area representing proposed district two is a stray, foreign, yellow portion resembling a map of New Hampshire. The small component is chiselled from the blue, and attached to the rest of the yellow contour to bolster the number of blacks allocated to the proposed majority black district under Plaintiff's alternative plan "B." Other obvious irregularities abound.

For instance, to incorporate portions of Burgess, Oxford four, and Taylor, the southern boundary of the yellow district takes a ninety degree turn and further descends into the bottom-left quadrant before returning to a somewhat horizontal path that meets the lower east side border of the district.

An obvious consequence and by-product of this geographic game of gymnastics is the proliferation of homogenous white supervisor districts in Lafayette County, Mississippi. The potentially greater influence which Plaintiffs presume Lafayette County blacks will wield with a district marked by a majority black voting-age population is actually a misnomer. The potential for increased minority influence that a majority composition of blacks within one district may afford is necessarily offset by the significantly diminished power of those left behind in the overwhelmingly white supervisor districts. To illustrate, under Plaintiffs' "B" plan blacks account for as few as 7% of the voting-age population in the proposed district five. By comparison, the percentage of voting-age blacks in district five under the present operative, precleared plan almost doubles. District one under Plaintiffs' proposed plan "B" contains the second lowest percentage of voting-age blacks, 14%, down more than ten points from the 26.4% black voting-age popu-

lation that currently shapes supervisor district one under the precleared plan presently in place. Reduced to such extreme disproportionate amounts, the voting-age black constituents of districts one and five in Plan "B" will have little or no chance of impacting election outcomes in their districts. A diminished stature of blacks in the collective composition of a particular district voting-age population may invite office seekers to discount and undervalue the worth of the minority vote in the computation of an election victory. If minority support is unnecessary to win, there is an unfortunate chance that minority concerns and interests could be overlooked or ignored. A diminution in minority group voting strength may occur not only through a diaspora; it may also arise by channeling blacks into districts " 'where they constitute an excessive majority.' " *Clark,* 813 F.Supp. at 1198 (quoting *Thornburg,* 478 U.S. at 46 n. 11, 106 S.Ct. at 2764 n. 11). After reviewing the voting age population data, the court finds that Plaintiffs fail to meet the first prong of the *Thornburg* threshold test. In the event that Plaintiffs had been able to overcome the initial hurdle of proving sufficient size and geographical compactness, they still would have had to meet the remaining two factors—political cohesion and whites voting as a bloc to defeat black candidates—which they have not done.

## 2. *RACIAL BLOC VOTING*

■ The two remaining prerequisites are complementary aspects of racial bloc voting. *Ewing v. Monroe County, Mississippi,* 740 F.Supp. 417, 419-20 (N.D.Miss.1990). Racial bloc voting "exists where there is 'a consistent relationship between the race of the voter and the way in which the voter votes', or to put it differently, where 'black voters and white voters vote differently.' " *Gingles,* 478 U.S. at 53, n. 21, 106 S.Ct. at 2768, n. 21, 92 L.Ed.2d at 48 n. 21. Plaintiffs' and Defendants' expert witness testimony on racial bloc voting patterns varies considerably. Plaintiffs' expert, Allan J. Lichtman, Ph.D., utilized two standard statistical methods which *Gingles* recognizes and discusses: ecological regression and extreme case analysis.

■ Through ecological regression analysis, Dr. Lichtman examined the behavioral differences between whites and blacks in voting and turnout. To determine voter preference for either a black candidate or a white candidate, Lichtman relied on extreme case analysis. This methodology essentially compares the strength of a black candidate's performance in heavily black precincts, with the amount of support received in predominantly white precincts.

Ideally, statisticians prefer homogenous precincts with a 90% voting age population for conducting extreme case analysis. Dr. Lichtman indicated during his trial testimony that the lack of any heavily concentrated or homogenous black precincts in Lafayette County limited his extreme case analysis of black voting behavior in the context of black versus white election contests to homogeneously white precincts.

Dr. Lichtman's written report, submitted as part of the case evidence, also states that the precinct structure of Lafayette County, Mississippi does not contain any extremely black precincts. Due to the absence of any suitable black precincts within Lafayette County, Mississippi, Plaintiffs' expert witness relied solely on homogenous precincts comprised of a 90% white majority voting age population for a reading of black voting behavior in the context of extreme case analysis tabulations. While he freely acknowledged that "results for extreme white precincts do not directly provide indications of black political cohesion," Dr. Lichtman still maintained that the extreme case analysis of the predominantly white precincts contained information that tended to support the theory that whites reject—and blacks prefer—black candidates. Thus, his analysis attempted to gauge the voting behaviors of blacks as well as whites in white versus black election contests.

In conducting his analysis, Lichtman compared the measure of support which black candidates running opposite white opponents received in predominantly white precincts with the support black candidates received overall. If the overall support for a black candidate was higher than the unit measure of support attributable to the district's pre-

dominantly white precincts, then, Lichtman concluded, black support for the black candidate exceeded the level of support offered by the white electorate. Lichtman testified that black candidates for the office of county supervisor in eight separate elections managed to muster only marginal support in predominantly white precincts. According to his report, the maximum percentage of support coming from a 90% white precinct for a black candidate with a white opponent was twenty-seven in the 1991 democratic primary for supervisor of district four. The overall percentage of support for the black candidate was forty-two. Under Dr. Lichtman's interpretation, the 15% difference between these figures is evidence of black political cohesion. Rather than an absence of cohesion, white bloc voting, Lichtman contends, hinders black success at the Lafayette County ballot box. The court disagrees and finds that the overwhelming weight of evidence suggests otherwise; political cohesion evades blacks in Lafayette County. Nor, for that matter, do whites in Lafayette County, vote as a bloc to defeat black candidates.

Through extreme case analysis, Plaintiffs sought to prove that black voter support of black candidates running opposite white opponents exceeded the amount of white voter support for black candidates in biracial contests. Their analysis essentially requires a dual assumption: white voters outside of the homogenous precinct voted no differently from those whites within it, and the entire black voting age district population backed the black candidate. In light of other, more persuasive evidence demonstrating significant black crossover vote, the court is unwilling to accept Dr. Lichtman's proposition. Without containing any heavily black precincts, Plaintiffs' analysis is incomplete; it sheds no light on and offers little proof of either black political cohesiveness or the preferred candidate of blacks. *Teague,* 807 F.Supp. at 403.

Plaintiffs' analysis also presumes that the greater support for white candidates among whites voting in heavily white precincts is sufficient to demonstrate that whites vote as a bloc to defeat the preferred candidate of blacks. Actual election results refute the argument that white bloc voting impedes the chances for political victory among black candidates. White voter support has contributed significantly to the election victories of Robert Pegues, William Buford, and Robert Blackmon, all of whom are black candidates. In those instances where a black has sought to hold the office of supervisor, as was the case in the 1991 primary election for district four supervisor, white voter support for the black candidate had to account for at least 20%, assuming for immediate purposes, that all potential black voter support in that particular race—22%—gravitated behind the black candidate. Twenty percent is hardly an inconsequential amount of support, especially when compared to lower levels of support in prior years.

Furthermore, Dr. Lichtman's ecological regression and extreme case analyses did not encompass other factors and variables that provide further insight to voting behaviors and patterns. As he explained at trial, Dr. Lichtman looks strictly at how, rather than why, people vote the way they do. In contrast, Dr. Weber incorporated other acceptable research methods associated with history, and the political and social sciences.

■ Considering other evidence becomes almost essential where, as here, the conditions for performing extreme case analysis are less than desirable. Particularly worth mentioning is the effect of multiple black candidacy on black voter support. Rather than uniting behind one black candidate to avoid forcing a run-off, the black vote, in much the same way as the white vote, was diffused or split among several competing candidates. The court fails to find persuasive evidence to support Plaintiffs' claim of a "strong association between race and voting." Factors other than race tend to drive voter choice and preference in Lafayette County, Mississippi. Further evidence in the record reinforces this notion of black crossover voting. White candidates have received substantial support from voters in majority black precincts.

**B. *THE TOTALITY OF THE CIRCUMSTANCES REVEAL EQUAL OPPORTUNITIES FOR POLITICAL PARTICIPATION***

■ Although Plaintiffs fail to meet the initial requirements of a § 2 claim, the

court, nevertheless concludes that, even if they had been successful in the preliminary stage, in view of the "totality of the circumstances," blacks have the same "opportunity . . . to participate in the political process and . . . elect representatives of their choice." 42 U.S.C. § 1973. "[T]he political processes leading to nomination or election in [Lafayette County] are . . . equally open to [black and white] participation. . . ." *Id.* This is evident from the number of black candidates campaigning for public office and winning elections with a broad base of support from black and white voters alike. Political participation, however, neither ensures, nor guarantees, political victories. "[T]he failure of a black candidate to emerge from a political contest as the winner" does not give rise to a § 2 violation under the Act. *Teague,* 807 F.Supp. at 404. The intent of the Voting Rights Act was to "eradicate impediments designed to" deprive blacks (and other protected minority groups) from running, supporting, and voting for candidates of their choice, to avail them of the same opportunities for *participation* in the political forum. By no means was the landmark legislation enacted to ensure the success of black or other minority candidates by carving the political terrain into irregularly and artificially shaped designs and patterns that result in the deliberate creation of "safe" majority minority districts reserved exclusively for minority candidates to represent.

■ The Supreme Court recently rejected this practice in the case of *Shaw v. Reno,* —— U.S. ——, ——, 113 S.Ct. 2816, 2827, 125 L.Ed.2d 511 (1993). Through a majority opinion authored by Justice Sandra Day O'Connor, the Court expressed its extreme distaste for racial gerrymandering, stating, "[R]acial gerrymander[ing] [ ] exacerbate[s] the very patterns of racial bloc voting that a majority minority district is sometimes said to counteract. . . . [T]he practice bears an uncomfortable resemblance to political apartheid." *Shaw,* —— U.S. at ——, 113 S.Ct. at 2827. When race supersedes such relevant and natural factors as political and geographical boundaries and becomes the driving force behind the creation of legislative districts, the result is an "impermissible racial stereotype" that "members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike, share the same political interests and will prefer the same candidates at the polls." *Shaw,* —— U.S. at ——, 113 S.Ct. at 2827. Rather than whether the black candidate was elected, the focus of any inquiry concerning a vote diminution or dilution claim remains whether there are equal opportunities for black participation. *Clark v. Calhoun,* 813 F.Supp. 1189, 1197 (N.D.Miss.1993). "[T]he inability of blacks to elect a black candidate is insufficient to establish a violation of the Voting Rights Act. The inquiry focuses on whether blacks have the same opportunity to be players in the political processes. Participation, not proportional representation, is the underlying intent of the Voting Rights Act. To exploit the statute as a vehicle for sketching "safe black or other minority seats" is an aberration of its intended purpose. *Teague,* 807 F.Supp. at 404. The landmark legislation expressly provides: [N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in population." 42 U.S.C. § 1973(b).

Prior to the recent Supreme Court decision in *Shaw,* voting rights legal scholars already had begun to scrutinize the worthiness of electoral districts custom designed for minorities. One of the most vocal critics has been University of Pennsylvania Law School Professor Lani Guinier. Professor Guinier, who has written extensively about the subject of voting rights, has raised questions concerning the inherent value of deliberately drawing districts exclusively for blacks and other minority groups. By desultorily separating blacks from white voters under the perceived auspices of the Voting Rights Act, the process of subdistricting becomes detrimental to blacks as well as whites by severely limiting their voting choices. When blacks are funneled into a majority minority district, they effectively become segregated from white voters. Thus, they are deprived of any opportunities for formulating voting coalitions with moderate white voters who, in turn, have similarly been "submerged" into a racially homogenous white

766

district on the assumption that white voters too are an indistinguishable "mass" of humanity. Such "districting strategies often promote noncompetitive election contests, which further reduce voter participation and interest.... [S]afe, minority seats discourage political competition and thus further diminish [voter] turnout." Lani Guinier, *No Two Seats: The Elusive Quest for Political Equality*, 77 Va.L.Rev. 1413, 1455 (1991).

Professor Guinier's criticisms come as no surprise. Minority districts often foster complacent attitudes in the minority representative elected to hold the seat. Once elected to a safe seat, a minority representative can easily ignore constituents' needs. Perceived as heirs apparent by themselves and their constituencies, minorities elected to racially gerrymandered districts enjoy the security and comfort of knowing they hold relatively secure seats and are largely immune from attack. Indeed, "incumbents enjoy extraordinary leverage in self-perpetuation through gerrymandering." Guinier, *supra*, at 1454. A seated minority representative in a legislative district purposely tilted with an abundant minority population holds a strong advantage that is often insurmountable, even to a minority challenger. Politicians elected to office from so-called "safe" minority districts ironically possess an unfair advantage over their constituents. The degree of accountability to voters is substantially diminished, and minority voters become casualties of the notion that "members of the same racial group ... think alike, share the same political [views], and prefer the same candidates...." *Shaw*, —— U.S. at ——, 113 S.Ct. at 2818. Relegating blacks to majority minority districts ultimately isolates them from the overall political process, and insulates the minority representative from voter dissatisfaction.

Witnesses testifying on behalf of Plaintiffs alluded to a general reluctance among those in the black civic community most likely to contemplate a run for political office actually to do so, unless within the confines of a district comprised of a majority black constituency. Further redistricting of Lafayette County certainly is no guarantee of additional black candidate victories. Nor, for that matter, should it serve as the mechanism for persuading blacks to pursue public office. If a defeatist mentality pervades inner black political circles of Lafayette County, then the prophecy will become self-fulfilling. The Voting Rights Act did not change the innate uncertainty of election outcomes. By its very nature, politics involves a high degree of chance, and the prospects of winning an election are subject to change many times over the course of a given election campaign. Thus, with passage of the Voting Rights Act, minorities did not inherit the right to a certain number of victories at every level of government. "The purpose of § 2 is not to guarantee a minority group that it will elect candidates of its choice, or even that it will be represented in whatever governing body is at issue.... [T]he potential to elect is all that is required under § 2. *Westwego Citizens for Better Government v. City of Westwego*, 946 F.2d 1109, 1117 n. 9 (5th Cir.1991).

■ If, hypothetically, the court were to order implementation of a new voting scheme that "still fail[ed] to produce [more] black winner[s]," the court can easily envision entertaining even further requests to "mandat[e] [alternate] designs which segregate blacks into greater and greater concentrations until at last a black is elected[.]" *Houston v. Haley*, 859 F.2d 341, 343 (5th Cir.1988) (vacated for other reasons by *Houston v. Haley*, 869 F.2d 807 (5th Cir. 1989)). Adopting such a course would directly contravene the Voting Rights Act. The purpose of the Voting Rights Act was to eradicate impediments designed to deny blacks (and other protected groups) the right to vote and participate in the political process. Plaintiffs equate the failure of a black candidate to emerge from a political contest as the winner with denying blacks effective political participation. Such contentions are an aberration of the legislative intent behind the Voting Rights Act. The landmark legislation sought to ensure political participation, not proportional representation. 42 U.S.C. § 1973. Political participation, in the context of the Voting Rights Act, means equal access to the political process of launching a winning campaign and ultimately producing a successful candidate who represents "all citizens, not just a particular faction." *Id.* at

344. Congress foresaw a political process in which a variety of groups, through bargaining and negotiating, formulated strong power bases and built coalitions to maximize voter potential so that everyone's vote counted in the political arena. Political victories are the fruit of organizing, energizing and mobilizing an electorate to turn out and vote for a particular candidate. Voter registration levels are comparatively the same for black and white Mississippians. According to Census Bureau information, 70.8% of whites and 71.4% of blacks in Mississippi were registered to vote in the 1990 Congressional election. The ecological regression analysis offered by Plaintiffs as evidence of the difference between voting behaviors of blacks and whites is nondemonstrative of a minority vote dilution claim.

"The idea that race or ethnicity, or language, or relig[ious] [beliefs] might become the basis for distributing voters during the redistricting processes" occurring every decade, is abhorrent to our nation's deeply held principles of democracy which guarantee each individual the right to vote according to his or her own proscribed political beliefs and interests. *Turner v. Arkansas*, 784 F.Supp. 553, 573 (E.D.Ark.1991). "There is no one" singular political philosophy or program assignable to black, white, Asian, Jewish, or Hispanic citizens. *Id.*

### 3. *CONSTITUTIONAL CLAIMS*

■ Similarly insubstantial are the constitutional claims which Plaintiffs advance. The current, precleared supervisor district plan is nonviolative of the one person one vote principle embedded in the U.S. Constitution. By incorporating 1990 census data, the present districting plan produces an extremely slight population deviation—2.11%—that falls well within the permissible 10% margin. Registering on the low end of the spectrum, the maximum population deviation of the 1991 redistricting plan for Lafayette County, Mississippi, easily fits the "category of minor deviations." *Brown*, 462 U.S. at 842, 103 S.Ct. 2690 at 2696, 77 L.Ed.2d at 222 (citations omitted). "Minor deviations from mathematical equality ... are insufficient to make out a prima facie case of invidious

discrimination under the Fourteenth Amendment...." *Brown v. Thomson*, 462 U.S. 835, 842, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214, 221 (1983) (*quoting Gaffney v. Cummings*, 412 U.S. 735, 745–748, 93 S.Ct. 2321, 2327, 37 L.Ed.2d 298 (1973), which describes various difficulties in population measurements). De Minimis deviations are unavoidable, permissible, and necessary to keep political subdivisions functional. *Brown*, at 842, 103 S.Ct. 2690 at 2696, 77 L.Ed.2d at 221. "[M]aintaining the integrity of various political subdivisions" is a legitimate objective of state government. *Brown*, 462 U.S. at 842, 103 S.Ct. 2690 at 2696, 77 L.Ed.2d at 221. Avoiding disruption of the precinct structure shaping Lafayette County's supervisory districts is one such legitimate state concern, one which Plaintiffs' expert, Victoria Caridas, admittedly disregarded in drawing proposed "model" districts to replace the precleared, 1991 plan presently in place. She testified that her sole, primary objective was the creation of a majority black district. The court is not in agreement with her notion that race should always take precedence over other pertinent factors associated with redistricting.

■ Even if the deviation had amounted to a percentage higher than the threshold amount, the current plan still would have been constitutionally valid, given Defendants' legitimate concerns regarding the county's precincts. *See Jenkins v. Pensacola*, 638 F.2d 1249, 1255 (5th Cir.1981) (14% deviation constitutionally permissible to avoid "undue distortion of precinct lines and contiguity").

The preservation of existing road mileage formulas to facilitate distribution of county funds under the current beat system of local county government was also recognized by Caridas as a valid state objective; however, it, too, was not considered in her "model" district formulations. Supervisors derive spending autonomy from a beat system of government, under which county funds go directly to individual supervisors. In contrast to the beat system, the unit system of government requires supervisors to contend with a central authority.

## IV. SUMMARY OF THE COURT'S CONCLUSIONS

In considering the record before it, the court finds that Plaintiffs have not shown blacks in Lafayette County, Mississippi, are both sufficiently large in number and geographically compact to constitute a majority in a single-member district. Furthermore, they have proven neither political cohesion among blacks nor bloc voting by whites to defeat minority preferred candidates. Even assuming the inverse, the court concludes that neither of Plaintiffs' claims is viable. The operative district plan neither dilutes black voting strength nor denies blacks equal access to the political process in violation of § 2 of the Voting Rights Act. Besides lacking a vote dilution claim, Plaintiffs' action is devoid of a viable "one person one vote" constitutional claim.

An order in accordance with this memorandum opinion shall be entered.